| | |
|---|---|
| RALPH C. NEAL, | Civil Action No. 08-C-0464 |
| Plaintiff, | Judge: William C. Greisbach |
| v. | |
| CHRISTOPHER & BANKS COMPREHENSIVE MAJOR MEDICAL PLAN, CHRISTOPHER & BANKS GROUP DISABILITY INCOME INSURANCE PLAN, and CHRISTOPHER & BANKS, INC. | **DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |
| Defendants. | |

## INTRODUCTION

The Plan's denial of Plaintiff's claim for medical benefits as both untimely and inconsistent with the Plan's definition of "medically necessary" was reasonable. Under the arbitrary and capricious standard to be applied by the Court, it must be upheld. In moving for summary judgment, Mr. Neal recognizes the existence of the six-month abstinence guideline for alcohol-induced transplants upon which the denial was based (in addition to his appeal being largely untimely). Indeed, he recognizes that the six-month guideline could expressly have been made a part of the Plan. He does not deny that he had only *six weeks* of sobriety. He disputes only whether it was reasonable for the Plan to consider the six- month guideline under the Plan's definition of "medically necessary," which requires that any treatment be "[c]onsistent in type, frequency and duration of

treatment with scientifically-based guidelines of national medical research, professional medical specialty organizations or governmental agencies that are accepted by the plan." To resolve this question, he asks this Court to act as if the six-month guideline did not, in fact, exist, because there is an on-going debate within the medical community about whether the six-month guideline is the best mode for identifying those patients with alcoholic liver disease for whom liver transplant procedures are suitable. And he asks the Court to determine whether the guideline is sufficiently "medical." In both instances, he improperly invites this Court to substitute its judgment for that of the Plan. To the contrary, Mr. Neal's motion for summary judgment should be denied and Defendants' cross-motion should be granted because the Plan acted consistent with a reasonable interpretation of the Plan language in adhering to the six-month abstinence guideline in its denial of Mr. Neal's pre-procedure request.

As demonstrated in Defendants' opening brief in support of their motion for summary judgment ("Defendants' opening brief"), Christopher & Banks' well-reasoned letter to Mr. Neal explains the basis for its decision to adhere to the guideline in denying his appeal and demonstrates the strong connections between the evidence Christopher & Banks examined, the Plan terms, and the conclusion reached. Under the deferential "arbitrary and capricious" standard, this decision is unassailable. Mr. Neal does not seriously attempt to argue that *the Plan's decision* to deny his appeal was unreasonable. Rather, Mr. Neal spends the majority of his brief alleging procedural errors in Coventry's Review Notification and arguing that this Court should not defer to Christopher & Banks' well-reasoned decision denying Mr. Neal's appeal because of these alleged errors. But

he fails to demonstrate either prejudice or substantial non-compliance with applicable procedures. Moreover, the Plan plainly gives Christopher & Banks the sole discretionary authority to determine eligibility for plan benefits and construe the terms of the Plan. And because Christopher & Banks actually and reasonably exercised this discretion in denying Mr. Neal's appeal, its decision is entitled to deference and must be upheld.

## ARGUMENT[1]

### A. No Heightened Standard of Review is Appropriate.

Mr. Neal cannot dispute that as Plan Administrator Christopher & Banks has sole discretionary authority to interpret the Plan's terms, including, expressly, the term "medically necessary," and to determine eligibility for benefits under the Plan. (DPFF, ¶ 2; Declaration of Glenn Salvo in Support of Defendants' Motion for Summary Judgment ("Salvo Decl."), Ex. B, at CB0087. Accordingly, the Plan's decision must be reviewed under the arbitrary and capricious standard. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989). When a Court considers whether a plan administrator's actions were arbitrary and capricious, "[a]ny questions of judgment are left to . . . the administrator of the Plan." *Mommaerts v. Hartford Life and Accidental Ins. Co.*, No. 05-C-0894, 2006 WL 1663754, at *3 (E.D. Wis. June 12, 2006) (Griesbach, J.).

---

[1] Defendants incorporate by reference Defendants' Proposed Findings of Fact in Support of Defendants' Motion for Summary Judgment ("DPFF") and Defendants' "Background" section of their Opening Brief in Support of Summary Judgment. Defendants also file herewith, not only the complete record before Christopher & Banks when it exercised its discretion to deny Mr. Neal's appeal, but also additional items from the records of Coventry relating to Mr. Neal's claims for benefits under the Plan. See Declaration of Deana Johnson, ¶ 2 ("Johnson Decl."). Defendants are filing the complete administrative record in response to Mr. Neal's suggestion and at his attorneys' request, even though the Eastern District of Wisconsin, unlike some districts, does not have a Local Rule or practice of requiring such a filing.

Case 1:08-cv-00464-WCG   Filed 02/19/09   Page 3 of 24   Document 28

Mr. Neal argues that his appeal should be "deemed exhausted" because of alleged imperfections in the form of the initial written denial notice (the "Review Notification"). He suggests that because his claim should be "deemed exhausted," the Court should review "de novo" the Plan's decision to deny his appeal. As an initial matter, his "deemed exhausted" argument makes no sense because there is no reason to adopt a fiction of exhaustion where, as here, Mr. Neal and his counsel actually exhausted his administrative remedies. Moreover, where, as here, there is a final decision by the Plan fiduciary, de novo review based on the absence of such decision is not authorized. Finally, because the claims process substantially complied with ERISA and Mr. Neal has failed to demonstrate any prejudice as the result of the claimed imperfections in the Review Notification, he cannot escape arbitrary and capricious review. Ultimately, his motion for summary judgment should be denied, and the Plan's motion should be granted.

**1.      Mr. Neal's "Deemed Exhausted" Argument Cannot Lead to De Novo Review.**

The DOL regulations provide, and the Supreme Court has held under the prior "deemed denied" version of the regulation, that once a claim is "deemed exhausted" a claimant may immediately bring a civil action to have the merits of his application determined, just as he may bring an action to challenge an outright denial of benefits. 29 C.F.R. § 2560.503-1(l); *Massachusetts Mut. Ins. Co. v. Russell*, 473 U.S. 134, 144 (1985).

But Mr. Neal did not regard his claim as exhausted and immediately bring a civil action following the Review Notification. To the contrary, he sought and received additional information about the denial, hired attorneys who sought and received additional information, and eventually appealed the denial to the Plan Administrator. (Defendants' Additional Proposed Facts in Response to Plaintiff's Motion for Summary Judgment ("Defs. Add'l Proposed Facts"), ¶ 1.) As demonstrated below and in Defendants' opening brief, the Plan then carefully exercised its discretion in considering and denying his appeal. Mr. Neal's attorneys never brought any concerns with the process to the Plan's attention during the appeal, or in response to the decision of Christopher & Banks, which expressly invited Mr. Neal to "present evidence why the appeal should not be rejected as untimely." (DPFF ¶ 52; Salvo Decl. Ex. A, at 0002.) Now, however, Mr. Neal belatedly tries to exalt form over substance in a last-minute attempt to avoid the deferential review. But he cannot get there from here. Even if his claim could, at one point, have been "deemed exhausted," he would not now be entitled to a less deferential standard of review.

Because the Plan exercised its discretion in denying Mr. Neal's appeal, it is entitled to deference regardless of whether the claim otherwise would be "deemed exhausted" in light of early procedural flaws. Mr. Neal asserts that "deemed exhausted" benefits determinations are not entitled to deference, but he is mistaken. To the contrary, the cases carefully distinguish between civil actions commenced because the plan failed to render a decision — in which cases there is no exercise of discretion to review — and cases where the plan administrator has made a decision but the claims process failed to

substantially comply with ERISA. Here, Mr. Neal did not bring suit before the Plan rendered a decision on his appeal. He participated in the appeal process, and only after he received the Plan's decision did he commence the present action. (Defs. Add'l Proposed Facts, ¶ 2.) Because as a matter of undisputed procedural fact the Plan exercised its discretion, the Plan's exercise of discretion is entitled to deference. *See, e.g.*, *Demirovic v. Building Service 32 B-J Pension Fund*, 467 F.3d 208, 212 (2d Cir. 2006); *Gatti v. Reliance Standard Life Ins.*, 415 F.3d 978, 983-84 (9th Cir. 2005); *Lamantia v. Voluntary Plan Admins., Inc.*, 401 F.3d 1114, 1123-24 (9th Cir. 2005); *Gritzer v. CBS, Inc.*, 275 F.3d 291, 296 (3d Cir. 2002); *see generally Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 111 (1989); *Central States, S.E. & S.W. Areas Health and Welfare Fund v. State Farm Mut. Auto. Ins. Co.*, 17 F.3d 1081, 1083 (7th Cir. 1994) ("Deferential review is appropriate only when the trust instrument allows the trustee to interpret the instrument ***and when the trustee has in fact interpreted the instrument***.") (emphasis added) (citing *Firestone*).

> **2.      Because the Claims Process Substantially Complied with ERISA and Mr. Neal Cannot Demonstrate any Prejudice as the Result of Claimed Imperfections in the Review Notification, He Is Not Entitled to De Novo Review.**

Plaintiff's opening brief carefully asserts that "[n]o reasonable person could derive from [the Review Notification] the fact that First Health was denying coverage because it had an absolute requirement of six months' pretransplantation abstinence from alcohol." Plaintiff's Brief, at 10. Here, however, the story Mr. Neal leaves out is more revealing than the story he tells. That is, he never alleges that he did not know about the six-month

transplant guideline, and he never alleges that he did not know his inability to demonstrate six months of pre-transplant abstinence was the reason his claim was denied.

In actuality, the six-month guideline was *from all sides* the focal point of the pre-certification request Coventry received from Mr. Neal's transplant surgeon. On March 16, 2006, Coventry received a telephone call from the University of Wisconsin Hospital inquiring whether Coventry has an alcohol abstinence policy for transplants. (DPFF ¶ 9; Salvo Decl., Ex. J, at 00164.) Coventry advised the University of Wisconsin Hospital that its policy requires candidates to have six months of sobriety and be in treatment for substance abuse. (DPFF ¶ 10; Salvo Decl., Ex. J, at 00164.) Five days later, Dr. Anthony D'Alessandro, M.D., Mr. Neal's surgeon at the University of Wisconsin Hospital, wrote to Coventry to request certification of the combined liver and kidney transplant procedure. (DPFF ¶ 12; Salvo Decl., Ex. H, at 00150-51.) In his letter, Dr. D'Alessandro acknowledged that the 6-month pre-transplant abstinence guideline is also the "normal abstinence period" required by the University of Wisconsin. (DPFF ¶ 11; Salvo Decl., Ex. H, at 0051.) Dr. D'Alessandro consulted this guideline in evaluating whether he should recommend the transplant despite Mr. Neal's inability to demonstrate six months of pre-transplant abstinence, and he communicated his decision to deviate from the guideline and his argument for doing so to Coventry in his letter. (*Id.*)

When Coventry sent the Review Notification, it also telephoned Mary Douglas, the UW transplant coordinator who actually dictated Dr. D'Alessandro's letter, and in addition to informing her of the rationale and appeals process for the non-certification decision, encouraged a peer-to-peer between Mr. Neal's transplant attending physician

Case 1:08-cv-00464-WCG   Filed 02/19/09   Page 7 of 24   Document 28

and Coventry's Medical Director Dr. Shewmake. (Defs. Add'l Proposed Facts, ¶ 3.) On

April 17, 2006, Coventry called and spoke with Dr. D'Alessandro, advising him, among

other things, of the peer-to-peer option. (Defs. Add'l Proposed Facts, ¶ 4.) On April 21,

2006, Coventry again called the University of Wisconsin Hospital regarding Mr. Neal.

(Defs. Add'l Proposed Facts, ¶ 5.) The Hospital informed Coventry that Mr. Neal's

doctor would not be doing a peer-to-peer "because if the non-cert was based on policy

then he would not waste his time." (Defs. Add'l Proposed Facts, ¶ 6.) There can be little

doubt that the University of Wisconsin knew the guideline was the reason for the non-

certification decision. Nor can there be any question that Mr. Neal knew in the spring of

2006 that the guideline was the reason for the non-certification decision, or, as discussed

below, that he knew this, at the latest, in the spring of 2007, months before his attorneys

submitted his appeal to the Plan Administrator.

Mr. Neal alleges several procedural flaws in the Review Notification. First, he

argues that the Review Notification does not reveal the "specific reason or reasons" for

the determination and does not identify the specific plan provision on which the

determination was based. In fact, as Mr. Neal elsewhere acknowledges in his brief, the

Review Notification *does provide the reason* for Coventry's determination *and the Plan*

*provision* on which the determination was based: "Our review has determined the

services to not be medically necessary"; "we are unable to recommend . . . as medically

necessary, as defined under your plan." (Plaintiff's Brief, at 10; Plaintiff's Proposed

Findings of Fact ("PPFF"), ¶ 14.)

8

The DOL regulations expressly address how specific the Plan must be when notifying a participant of an adverse benefits determination based on a plan's definition of "medical necessary."  While Mr. Neal faults the Plan for not stating that "an internal rule, guideline, protocol or other similar criterion was relied upon in making the adverse determination," 29 C.F.R. § 2560.503-1(g)(1)(v)(A), this part of the DOL regulations does not apply to the Review Notification.  To the contrary, because the denial turned on the Plan's definition of "medically necessary," the applicable section of the DOL regulations is 29 U.S.C. § 2560.503-1(g)(1)(v)(B):

> If the adverse benefit determination is based on a medical necessity or experimental treatment or similar exclusion or limit, either an explanation of the scientific or clinical judgment for the determination, applying the terms of the plan to the claimant's medical circumstances, or a statement that such explanation will be provided free of charge upon request.

Adverse benefit determinations like the Review Notification must comply with (A) "*or*" (B), but not both.  *See* 29 U.S.C. § 2560.503-1(g)(1)(v).

Here, the Review Notification complies with (B) by acknowledging that the determination was based on the Plan's definition of "medically necessary" and stating as follows: "The clinical rationale used in making this determination is available in writing upon request."  (Defs. Add'l Proposed Facts, ¶ 7.)  In fact, Mr. Neal and others acting on his behalf were also advised that they could request the clinical rationale in writing on more than one other occasion.  (Defs. Add'l Proposed Facts, ¶ 7.)  Mr. Neal's mother-in-law, acting on his behalf, eventually made this request in April 2007, and Mr. Neal received in May a response from Coventry informing him in part as follows:

We have received your request for additional information regarding the determination and criteria used in the non-certification concerning the transplant. Listed below is the relevant information that was used in our determination.

Our Medical Review Department reviewed the clinical documentation submitted for the appealed services. A non-certification was determined for the transplant and transplant related charges. The rational for the adverse determination was that a patient requesting a liver/kidney transplant must be free from alcohol for a minimum of 6 months according to internal review.

Coventry Health Care Medical Director's in unit consult indicates, this is a 59 year old who has alcoholic cirrhosis with concomitant renal failure. He has been abstinent from alcohol for 6 weeks. He has ascites as well as hepatic hydrothorax. MELD (Model for End Stage Liver Disease)=39. Cause of renal failure is thought to be hepatornenal syndrome. By definition this patient is considered an active alcohol user and in not a transplant candidate per internal review.

(Defs. Add'l Proposed Facts, ¶ 9.) The 2007 correspondence demonstrates that Mr. Neal had ready access, consistent with the DOL regulations, to this information; he just had to request the clinical rationale as directed in the Review Notification. And as Mr. Neal recognizes in his opening brief, "Such an explanation would have made it perfectly clear why coverage was being denied, and would have permitted Mr. Neal to make whatever arguments he wanted to make on appeal." (Plaintiff's Brief, at 10.) This letter also demonstrates that Mr. Neal was informed months before his attorneys first contacted the Plan about bringing his appeal that the denial was based on the six-month abstinence guideline.

Finally, Plaintiff's opening brief protests that the Review Notification did not inform Plaintiff how to file an appeal. But this mid-lawsuit suggestion, unsupported by any evidence from Mr. Neal, let alone competent evidence, is calculated gamesmanship.

Within the text of the Review Notification, it plainly says "Please see the attachment describing the appeals process and required authorization release." (Defs. Add'l Proposed Facts, ¶ 10.) However, because the copies of Review Notifications that Coventry sent to Christopher & Banks did not include form attachments to clog the files of Christopher & Banks, Plaintiff detected that the multiple Review Notifications produced by Christopher & Banks in this lawsuit from its files did not include the described attachments. This is the basis of the no-notice hay that Plaintiff now tries to make.

Confronted for the first time in this lawsuit with this assertion of no appeal notice,[2] Christopher & Banks asked Coventry for copies of the Review Notifications that it sent to Mr. Neal. As the Court can plainly see, the "Information on the Appeals Process" attachment was invariably included in the multiple Notifications sent to Mr. Neal, including the subject Notification, and the appeals attachment explains the appeal process in great detail. (Johnson Decl., at FH 150-151; Defs. Add'l Proposed Facts, ¶ 11.)

Even if the Review Notification, by itself, could somehow be construed as in technical violation of the DOL regulations, Coventry's claims process nevertheless substantially complied with ERISA. Citing two district court cases from other circuits, Mr. Neal incorrectly suggests that the substantial compliance doctrine has been abolished. In fact, as this Court has recognized, the Seventh Circuit continues to

---

[2] Christopher & Bank's appeal denial letter invited him to "present evidence why the appeal should not be rejected as untimely." (Defs. Add'l Proposed Facts, ¶ 12.) Mr. Neal said nothing in response to this invitation.

recognize and apply the doctrine. *See, e.g.*, *Hackett v. Xerox*, 315 F.3d 771, 775 (7th Cir. 2003); *O'Connell v. Northland Lutheran Retirement Comm.*, No. 07-C-637, 2008 WL 2782897 (E.D. Wis. July 15, 2008) (Griesbach, J.).

In evaluating whether a claims process substantially complied with the purposes of ERISA, the Seventh Circuit has recognized certain "core requirements":

> [t]he persistent core requirements of review intended to be full and fair include knowing what evidence the decision-maker relied upon, having an opportunity to address the accuracy and reliability of that evidence, and having the decision-maker consider the evidence presented by both parties prior to reaching and rendering his decision.

*Halpin v. W.W. Grainger, Inc.*, 962 F.2d 685, 689 (7th Cir.1992) (quoting *Brown v. Ret. Comm. of Briggs & Stratton Ret. Plan*, 797 F.2d 521, 534 (7th Cir.1986)). "Although the applicable regulations are specific in pronouncing the requirements, strict compliance is not mandated." *Tolle v. Carroll Touch, Inc.*, 23 F.3d 174, 180 (7th Cir. 1994).

As demonstrated above, Mr. Neal had access, upon request, to Coventry's clinical rationale, as the regulations require. Mr. Neal could have requested this rationale at any time, and having requested and received this information he could have addressed the accuracy and reliability of this rationale in his appeal. He nevertheless did not seek to question the Plan's reliance on the guideline during the course of his appeal. Nor did he protest that these perceived procedural flaws prevented him from bringing a timely appeal when the Plan invited him to "present evidence why the appeal should not be rejected as untimely." (Defs. Add'l Proposed Facts, ¶ 12.) *Cf. Ames v. Am. Nat'l Can Co.*, No. 96-C-8276, 1997 WL 733893, at *14 (N.D. Ill. Nov. 7, 1997) (finding that claimant could not show a denial of meaningful access to the claim procedure where Plan

continued to invite claimant to provide additional information even after claimant filed suit).

Most importantly, there is no evidence that Mr. Neal was in anyway prejudiced by any procedural defect. While Mr. Neal raises several technical challenges to the Review Notification, he does not and cannot complain that he in fact was deprived of any of ERISA's "core requirements." *Militello v. Central States, S.E. & S.W. Areas Pension Fund*, 360 F.3d 681, 690 (7th Cir. 2004) (finding substantial compliance where Plaintiff did not complain that the plan's failure to follow its appeal procedures deprived him of any of these "core requirements") (citing *Buttram v. Central States, S.E. & S.W. Areas Health and Welfare Fund*, 76 F.3d 896, 901 (8th Cir.1996)); *accord Reimann v. Anthem Ins. Cos.*, 1:08-cv-0830, 2008 WL 4810543, at *1 (S.D. Ind. Oct. 31, 2008) ("[The Plan] made some procedural mistakes in its handling of the case, but those mistakes were either harmless or have already been remedied by [the Plan.]"). Indeed, Mr. Neal's technical arguments consider only what a "reasonable person" would learn upon reading the Review Notification. It is telling that Mr. Neal does not admit what he actually knew and what additional information he actually learned before bringing his appeal. Strangely, the only "additional" evidence Mr. Neal suggests he would have submitted to the Plan had the Review Notification invited him to submit additional evidence — which it did[3] — is the same article from the National Institute on Alcohol Abuse and Alcoholism that Dr. Imagawa identified in his report and that the Plan considered in

---

[3]     The Appeal Process Attachment to the Review Notification in fact recommends that the participant provide medical records with the appeal. (Defs. Add'l Proposed Facts, ¶ 14.)

denying his appeal. (Plaintiff's Brief, at 10). Mr. Neal never identifies any prejudice he

actually suffered, and his failure to do so defeats his procedural arguments. *E.g.*,

*Militello*, 360 F.3d at 690.[4]

### B. Christopher & Banks' Determination that a Significant Part of Mr. Neal's Appeal Was Untimely Was Not Arbitrary and Capricious.

Mr. Neal does not dispute that he was aware of the 180-day deadline for bringing

his appeal. He recognizes in his brief, in fact, that "the Review Notification did inform

Mr. Neal that he had the right to appeal (and a deadline of 180 days to do so)."

(Plaintiff's Brief, at 11.)

Mr. Neal attempts to re-frame his failure to request an appeal within 180 days as a

question of whether he failed to exhaust his administrative remedies. While it is true that

Mr. Neal was required to exhaust his administrative remedies, the issue for the Court to

decide is not whether he exhausted his administrative remedies. Defendants have not

raised as a defense his failure to exhaust his administrative remedies before bringing the

---

[4] Were the Court to conclude that Christopher & Banks did not exercise its discretion to render a decision **and** there was not substantial compliance with applicable requirements, then "the appropriate remedy respecting the status quo and correcting for the defective procedures is to provide the claimant with the procedures that [he] sought in the first place . . . on remand before the plan administrator." *Hackett v. Xerox*, 315 F.3d 771, 776 (7th Cir. 2003) (citation omitted); *Gallo v. Amocco Corp.*, 102 F.3d 918, 923 (7th Cir. 1997); *Saint Joseph's Hospital of Marshfield, Inc.*, 459 F. Supp. 2d 824, 834 (7th Cir. 2006); *Cheng v. Unum Life Ins.Co.*, 291 F. Supp. 2d 717, 721-22 (N.D. Ill. 2003). The Seventh Circuit treats denial of benefits claims, which are remanded to the plan administrator, differently than termination of benefits claims, in which courts are empowered to reinstate benefits themselves. *See, e.g.*, *Hackett v. Xerox*, 315 F.3d 771, 776 (7th Cir. 2003). Because Mr. Neal seeks to appeal a **denial of benefits**, the proper remedy, if the Court were to conclude that Christopher & Banks did not render a decision and there was not substantial compliance, would be to remand his claim and require the Plan Administrator to correct the procedural irregularities, resume the appeal, and exercise its discretion in making the benefits determination. *Id.* In such circumstances, should the plan administrator deny the appeal, and should the participant again seek judicial review, the plan administrator would then have exercised its discretion, and its decision would then be entitled to deferential "arbitrary and capricious" review. *See, e.g.*, *Krawczyk v. Harnischfeger Corp.*, 869 F. Supp. 613, 617 & 621-22 (E.D. Wis. 1994).

instant action.  Rather, the issue for the Court to decide is whether the Plan's decision to deny his appeal in significant part as untimely was "arbitrary and capricious."  As demonstrated in Defendants' opening summary judgment brief, under the "arbitrary and capricious" standard, Mr. Neal cannot dispute that Christopher & Banks properly determined that a significant portion of his appeal was untimely.  *See, e.g.*, *Gayle v. United Parcel Service, Inc.*, 401 F.3d 222, 230 (4th Cir. 2005) (granting summary judgment against a plan participant because she had failed to comply with her ERISA plan's 180-day appeal requirement); *see also Zamecnik v. Abbco.*, 237 Fed.Appx. 102, 2007 WL 1827246 (7th Cir. June 26, 2007) (affirming summary judgment in favor of ERISA plan where initial benefits claim was not timely submitted).  As further demonstrated in Defendants' opening brief, Defendants are therefore entitled to summary judgment.

### C.   Christopher & Banks' Determination that Mr. Neal's Transplant and Transplant-Related Services Are Not Covered By the Plan Was Not Arbitrary and Capricious.

Mr. Neal's opening brief confirms (1) the existence of the subject guideline, (2) that the guideline requires six months of pre-transplant abstinence from alcohol, and (3) that he had only six weeks of pre-transplant abstinence.  He also suggests that this six-month guideline could expressly have been made a part of the Plan.  He disputes only whether it was reasonable for the Plan to consider the six-month guideline under the Plan's definition of "medically necessary," which requires that any treatment be "[c]onsistent in type, frequency and duration of treatment with scientifically-based

guidelines of national medical research, professional medical specialty organizations or governmental agencies that are accepted by the plan."

Mr. Neal argues that the Plan's interpretation of this provision was "wrong" because there is academic criticism of the guideline in the medical research community, because he asserts that the guideline is not directed at whether a procedure is "medically necessary," and because he asserts that the guideline is an "ethical" rather than a "medical" guideline. These arguments do not withstand scrutiny. Under the "arbitrary and capricious" standard, Mr. Neal cannot dispute that Christopher & Banks reasonably determined his transplant and transplant-related services were not covered under the Plan.

> 1. **Mr. Neal Cannot Show that the Plan's Reliance on the Six-Month Abstinence Guideline Was Arbitrary and Capricious by Showing that There Is Academic Criticism of the Guideline in the Medical Research Community.**

In moving for summary judgment, Mr. Neal recognizes the existence of the six-month abstinence guideline. He confirms that Coventry Medical Director Dr. Shewmake's guidelines indicate "No smoking, drugs, or alcohol for at least six months prior to transplant." (PPFF ¶ 17; Plaintiff's Brief, at 4.) And in criticizing the guideline, he relies on the same articles considered by the Plan in denying his appeal. (Plaintiff's Brief, at 13-15.) That these articles criticize the guideline proves its existence. For example:

- ▪ The publication of the National Institute On Alcohol Abuse and Alcoholism, entitled "Liver Transplantation for Alcoholic Liver Disease," observes that "[s]ome transplant programs and insurance companies insist on an absolute 6-month period of abstinence," and proceeds to criticize this absolute "6-month rule" in favor of multidisciplinary guidelines that while not requiring six months nevertheless include, for example, at least a "few

months of sobriety as a test of short term compliance," as recommended by the United Network for Organ Sharing ("UNOS").

(Defs. Add'l Proposed Facts, ¶ 14.)  Finally, Mr. Neal quotes Dr. D'Alessandro's letter recognizing that the University of Wisconsin Hospital's "normal abstinence period is six months."  (PPFF ¶ 11, Plaintiff's Brief, at 3).  Dr. D'Alessandro's letter also recognizes, and Mr. Neal does not dispute, that he had only six weeks of abstinence.  (PPFF ¶ 11; Plaintiff's Brief, at 3; DPFF, ¶ 16; Salvo Decl. Ex. H, at 0151.)  Although Mr. Neal suggests that the six-month abstinence guideline could be made part of the Plan, he objects that this guideline "appears no where in the plan."  (Plaintiff's Brief, at 1 & 17.)

Mr. Neal first argues that the Plan's decision to continue to accept and apply the six-month abstinence guideline was "wrong" in light of two scholarly articles that criticize six-month pre-transplant abstinence requirements.  But the facts that one of these two articles was brought to the Plan's attention by an independent medical consultant, and both were later considered by the Plan in reaching its decision, are evidence of the Plan's careful exercise of its discretion, not that the Plan's decision was arbitrary and capricious.

Dr. Imagawa brought the National Institute article to the Plan's attention and informed the Plan that "[m]any articles continue to insist that the 'six-month rule' is arbitrary," and that UNOS does not require a six-month abstinence period.  (DPFF, ¶¶ 43 & 44;  Salvo Decl. Ex. E, at 123.)   Nevertheless, Dr. Imagawa considered the Plan's definition of "medically necessary" and opined, as had Dr. Shewmake, that Mr. Neal's transplant did not meet all the criteria of the Plan's definition of "medically necessary."

Case 1:08-cv-00464-WCG   Filed 02/19/09   Page 17 of 24   Document 28

(DPFF, ¶ 41.)  Dr. Imagawa even considered whether deviation from the six-month guideline would be appropriate in light of this criticism, but found it quite unlikely that Mr. Neal had *any* insight into his disease process in April 2006.  (DPFF, ¶ 43; Salvo Decl. Ex. E, at 123.)  "He underwent surgery for pancreatitis secondary to alcohol in March 2005 and continued to drink.  (*Id.*)  He was seen for transplant evaluation in December of 2005 and continued to drink."  (*Id.* at 123-24.)  In fact, as of March 26, 2006, he was able to demonstrate only *six weeks* of pre-transplant abstinence.  (PPFF ¶ 11; Plaintiff's Brief, at 3; DPFF, ¶¶ 16 & 42; Salvo Decl. Ex. E & H, at 124 and 151.)

As demonstrated in Defendants' opening brief, only after an appropriately thorough deliberative process did Christopher & Banks conclude that Mr. Neal's transplant and transplant-related services were not covered by the Plan.  Christopher & Banks not only carefully considered the information before it, but it sought out new additional information in making its decision.  (*See, e.g.*, DPFF ¶ 56.)  Moreover, as the Seventh Circuit has recognized, the fact that Christopher & Banks considered the opinions of independent experts and medical consultants is evidence of an appropriate deliberative process.  *See Mote v. Aetna Life Ins. Co.*, 502 F.3d 601, 608 (7th Cir. 2007).

Mr. Neal suggests that this Court should enter the scholarly debate within the medical community about whether the six-month guideline is the best mode for identifying patients who are suitable for liver transplant procedures, asking this Court to substitute its judgment for that of the Plan.  Such a decision would not only contravene the binding terms of the Plan, but it would effectively close the debate within the medical community, forbidding transplant centers, providers, and plan administrators from

following their well established six-month abstinence guidelines.  But courts do not have the institutional competence to make this determination for the medical community.  Nor, under the arbitrary and capricious standard, can this Court substitute its judgment for that of the Plan Administrator.  Because the Plan's decision is not "downright unreasonable," it must be affirmed.  *Williams v. Aetna Life Ins. Co.*, 509 F.3d 317, 321 (7th Cir. 2007).

### 2. Mr. Neal Cannot Show that the Plan's Reliance on the Six-Month Abstinence Guideline Was Arbitrary and Capricious by Artificially Limiting the Plan's Definition of "Medical Necessary"

Without citation to law or fact,[5] Mr. Neal next attempts to limit the application of the Plan's requirement that services be "[c]onsistent in type, frequency and duration of treatment with scientifically-based guidelines of national medical research, professional medical specialty organizations or governmental agencies that are accepted by the plan," to, in his words, "'scientifically-based guidelines' <u>for medical necessity</u>."  (Plaintiff's Brief, at 16.)  But, unlike the Plan's interpretation, Mr. Neal's proposed interpretation is both false and unhelpful.

Throughout his brief, Mr. Neal ignores the fact that "medically necessary" is a carefully defined Plan term.  The Plan defines "medically necessary" as follows:

---

[5]       Mr. Neal also incorrectly asserts that the Plan's "medically necessary" requirement is an "exclusion." To the contrary, that a service must be "medically necessary" is not an exclusion but a part of the Plan's grant of coverage.  As explained in the Plan, "[t]he plan provides benefits only for covered services and supplies that are medically necessary for the treatment of a covered illness or injury."  (Defs. Add'l Proposed Facts ¶ 17.)  As to transplants, the Plan explains specifically that "Only those procedures that are covered and certified as *medically necessary* will be eligible under the Plan."  (Defs. Add'l Proposed Facts ¶ 18.)  Because the Plan covers "medically necessary" services, this basic prerequisite to coverage cannot possibly ever lead to the "exclusion" of an otherwise covered benefit.  Thus, similarly confronted with Plan language that "[b]enefits will be paid only for 'Medically Necessary' care and treatment of Sickness or Injury," the Eighth Circuit concluded that the "medically necessary" provision is not an exclusion.  *Farley v. Benefit Trust Life Ins. Co.*, 979 F.2d 653, 658 (8th Cir. 1992).  Confronted with this same plan language, the Seventh Circuit similarly concluded that the "medically necessary" provision is not an "exclusion."  *Fuja v. Benefit Trust Life Ins. Co.*, 18 F.3d 1405, 1408 (7th Cir. 1994).

Medically necessary services and/or supplies the *plan administrator* determines, in the exercise of its discretion, to be:

1. Medically appropriate, which means that the expected health benefits (such as increased life expectancy, improved functional capacity, prevention of complications, relief of pain) exceed the expected health risks by a sufficiently wide margin;

2. Necessary to meet the basic health needs of the patient as a minimum requirement;

3. Rendered in the most cost-efficient manner and setting appropriate for the delivery of the health service;

4. Consistent in type, frequency and duration of treatment with scientifically-based guidelines of national medical research, professional medical specialty organizations or governmental agencies that are accepted by the plan;

5. Consistent with the diagnosis of the condition;

6. Required for reasons other than the comfort or convenience of the patient or his or her *physician*; and

7. Of demonstrated value based on clinical evidence reported by peer reviewed medical literature and by generally recognized academic medical experts; that is, it is not *investigational/experimental.*

(DPFF ¶ 6; Salvo Decl., Ex. B, at 0083.)   Under the Plan, a "treatment, procedure, service, or supply must meet all of the criteria listed above to be considered medically necessary and to be eligible for coverage."  (DPFF ¶ 7; Salvo Decl., Ex. B, at 0083.)

Mr. Neal argues that the transplant was "medically necessary" because Dr. D'Alessandro opined in March 2006 that he did not believe Mr. Neal's overall health

would allow him to wait the total six-month period. (Plaintiff's Brief, at 16.) But the fact that a procedure might be "[n]ecessary to meet the basic health needs of the patient as a minimum requirement," is but one of the seven criteria (criterion 2). (DPFF ¶ 6; Salvo Decl., Ex. B, at 0083.)

Mr. Neal also attempts to insert the words "medically necessary" or "medical necessity" into criterion 4, to limit this criterion's requirement to consistency with "'scientifically-based guidelines' <u>for medical necessity</u>," suggesting the guidelines would have to state that "liver transplants are not medically necessary for patients who have less than six months' pretransplantation abstinence." But this attempt necessarily fails for several reasons.

<u>First</u>, and most importantly, there is no basis in the text of the Plan for this odd revision, nor does Mr. Neal's alternative interpretation show that the Plan's interpretation was unreasonable. To the contrary, the plain meaning of criterion 4 includes no such limitation. It requires consistency "in type, frequency and duration of treatment with scientifically-based guidelines of national medical research, professional medical specialty organizations or governmental agencies that are accepted by the plan." (DPFF ¶ 6; Salvo Decl., Ex. B, at 0083.)

<u>Second</u>, this interpretation is inherently circular in that it uses the phrases "medically necessary" and "medical necessity" in defining "medically necessary."

<u>Third</u>, there is no evidence that the six-month abstinence guideline is not a "'scientifically-based guideline [for medical necessity]." Indeed, the fact that Dr. Shewmake and Dr. Imagawa both consulted the guideline in determining whether Mr.

Neal's transplant was "medically necessary" demonstrates that the guideline is such a guideline.[6]

Similarly, Christopher & Banks reasonably concluded that Mr. Neal's transplant, following only six weeks of pre-admission claimed abstinence, was not covered under the Plan because the effectiveness of such a transplant was unproven based on clinical evidence reported in peer-reviewed medical literature, and thus the transplant was "investigational/experimental" as defined in the Plan. (DPFF ¶ 67; Salvo Decl., Ex. A, at 00003.) Thus, Christopher & Banks reasonably concluded that Mr. Neal's transplant was not covered under the Plan because it was also "investigational/experimental" as defined in the Plan.

Mr. Neal offers a creative, albeit flawed alternative interpretation of "medically necessary," but he offers no basis for the Court to conclude that the Plan's interpretation was in any way unreasonable. His motion for summary judgment should be denied.

**3.      Mr. Neal Cannot Show that the Plan's Reliance on the Six-Month Abstinence Guideline Was Arbitrary and Capricious by Arguing that It Is Not a "Medical" Guideline.**

Mr. Neal also suggests that the Plan should not have relied on the guideline because the concerns underlying abstinence requirements are "ethical," rather than "medical." This is incorrect for two reasons. First, the correlation between post-transplantation relapse and the six-month guideline noted in Meta-Analysis article is

_____

6        Dr. D'Alessandro also consulted this guideline in evaluating whether he should recommend the transplant despite Mr. Neal's inability to demonstrate six months of pre-transplant abstinence. Although he made the decision to deviate from the University of Wisconsin's normal guidelines, Christopher & Banks considered all the evidence and acted reasonably in adhering to the Plan definition of "medically necessary" and the well-recognized six-month abstinence guidelines.

undoubtedly "medical" and "scientific" — "risk of relapse posttransplantation is a prominent clinical concern." (Defs. Add'l Proposed Facts, ¶ 15.) The Meta-Analysis article notes specifically a significant association between post-transplantation relapse and "a pretransplantation duration of abstinence of 6 months or less." (Defs. Add'l Proposed Facts, ¶ 16.) Indeed, the article suggests that the limited impact of this variable "may be due to the fact that transplant programs strive to apply the '6-month rule' as a key criterion for candidate selection." (DPFF ¶ 61; Salvo Decl., Ex. G, at CB 00145.) Moreover, just as ethical considerations often inform legal debates, it would be remarkable if ethical considerations did not inform medical debates. That is, it does not follow that a particular medical guideline ceases to be "scientific" or "medical" merely because the medical community debates whether the guideline is desirable, at least in part from an ethical perspective. Otherwise, "medical ethics" would be an oxymoron, rather than a course in medical school. Regardless, Mr. Neal suggests no objective criteria (and Defendants are aware of none) with which this Court can differentiate between the "ethical" and "medical" in evaluating whether the subject guideline is sufficiently "medical." Certainly the journal articles on which Mr. Neal relies do not make this remarkable claim. This Court has before it no facts on which it could conclude that Plan's consideration of the six-month abstinence guideline was arbitrary and capricious because it is not sufficiently "scientific" or "medical." Indeed — whatever these terms may mean — in examining the passage quoted in Plaintiff's brief, it does not seem a far cry to characterize a patient "damaging the transplanted liver," as a "medical" concern. (Plaintiff's Brief, at 16.) Because Christopher & Banks' interpretation of "medically

Case 1:08-cv-00464-WCG   Filed 02/19/09   Page 23 of 24   Document 28

necessary" is reasonable in that it "makes a rational connection between the issue to be decided, the evidence in the case, the text under consideration, and the conclusion reached, this court cannot disturb it." *Mommaerts*, 2006 WL 1663754, at *3 (internal quotation marks omitted).

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court deny Mr. Neal's motion for summary judgment and grant Defendants' cross-motion.

Dated: February 19, 2009

DORSEY & WHITNEY LLP

By s/ Glenn M. Salvo
Glenn M. Salvo #1046178
Timothy E. Branson #0174713 MN
Suite 1500, 50 South Sixth Street
Minneapolis, MN 55402-1498
Telephone: (612) 340-2600

*Attorneys for Defendants Christopher & Banks Comprehensive Major Medical Plan, Christopher & Banks Group Disability Income Insurance Plan, and Christopher & Banks, Inc.*