# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

RALPH C. NEAL

          Plaintiff,

    v.

CHRISTOPHER & BANKS
COMPREHENSIVE MAJOR MEDICAL PLAN,         Case No. 08-C-464

CHRISTOPHER & BANKS
GROUP DISABILITY INCOME INSURANCE PLAN, and

CHRISTOPHER & BANKS, INC.,

          Defendants.

---

## DECISION AND ORDER

---

Plaintiff Ralph C. Neal brought this action seeking medical benefits under his employer's comprehensive major medical plan for a combined liver and kidney transplant he underwent in April of 2006 and related treatment provided thereafter. Neal's claims for benefits were initially denied on the ground that the transplant and related services did not fall within the definition of medical necessity contained in the plan. The denial was upheld on administrative review on the same ground and, additionally as to some of the claims, on the ground that Neal's appeal was untimely. Because the action arises under the Employee Retirement Income and Security Act of 1976 ("ERISA"), 29 U.S.C. §§ 1001 *et seq.*, federal jurisdiction is conferred by 28 U.S.C. § 1331. The case is presently before the Court on cross motions for summary judgment. For the reasons set forth below, Christopher & Banks' motion will be granted and Neal's motion denied.

## FACTS

Neal was admitted to Bellin Memorial Hospital in Green Bay on March 9, 2006, and transferred to the University of Wisconsin Hospital and Clinic the following day where doctors determined he needed a liver transplant due to "cirrhosis presumably secondary to alcohol abuse." (Pl.'s Proposed Finding of Fact ("PPFOF") ¶¶ 7-8.) The cirrhosis had been discovered approximately one year earlier when Neal underwent a Whipple Procedure to remove a pancreatic mass that turned out to be benign. Despite the diagnosis of cirrhosis of his liver, Neal continued to intermittently consume alcohol up until six weeks before his admission to Bellin Memorial Hospital on March 9. (Defendants' Proposed Findings of Fact ("DPFOF") ¶¶13-15.)

As a retiree of Christopher & Banks, Inc., a Minneapolis-based apparel retailer, Neal was a participant in the Christopher & Banks Comprehensive Major Medical Plan ("the Plan"). (PPFOF ¶ 1.) The Plan is a self-funded ERISA employee welfare benefit plan, within the meaning of 29 U.S.C. § 1002(1). (DPFF ¶ 1.) Christopher & Banks serves as the Plan Administrator, but contracts with Coventry Health Care (previously First Health, and hereinafter collectively "Coventry") to perform claims processing and other specified services relating to the Plan. The Plan affords Christopher & Banks broad discretion to construe the terms of the Plan and determine eligibility for benefits:

> The plan administrator shall have the sole discretionary authority to determine eligibility for plan benefits or to construe the terms of the plan, and benefits under the plan will be paid only if the plan administrator decides in its discretion, that the participant or beneficiary is entitled to such benefits.

(DPFOF ¶ 2; Decl. of Glenn Salvo, Ex. B at 79.)

2

On March 16, 2006, Coventry received a telephone call from UW Hospital inquiring whether Coventry has an alcohol abstinence policy for transplants. Coventry advised that its policy requires that candidates for transplants have six months of sobriety and be in treatment for substance abuse. (DPFOF ¶¶ 9-10.) On March 21, 2006, Dr. Anthony D'Alessandro, Neal's transplant surgeon, wrote to Coventry requesting prior authorization for a combined kidney and liver transplant for Neal. Dr. D'Alessandro stated that, although UW Hospital's normal abstinence period was also six months, he did not feel that Neal's overall health would allow him to wait that long. Dr. D'Alessandro noted that Neal seemed sincere in his willingness to seek treatment and that he had a supportive family to help him through the recovery process. The letter concluded, "Right now we see no technical, medical, infectious or psychosocial contraindications to proceeding and feel that we should place his name to the active liver transplant waiting list." (DPFOF ¶ 16.)

Following review by Floyd Shewmake, M.D., J.D., its medical director, Coventry wrote to Neal on March 23, 2006, to inform him that it was unable to recommend certification of the proposed transplant as "medically necessary," as defined in the Plan. While it is apparently undisputed that the transplant was "medically necessary" in the ordinary sense that if Neal did not receive a new liver, he would die, Coventry made its determination based on the Plan's definition of the phrase, which incorporates other considerations. The Plan defines "medically necessary services and/or supplies" as such services and/or supplies that the plan administrator determines, in the exercise of its discretion, to be:

1. Medically appropriate, which means that the expected health benefits (such as increased life expectancy, improved functional capacity, prevention of complications, relief of pain) exceed the expected health risks by a sufficiently wide margin;

3

2.      Necessary to meet the basic health needs of the patient as a minimum requirement;

3.      Rendered in the most cost-efficient manner and setting appropriate for the delivery of the health service;

4.      Consistent in type, frequency and duration of treatment with scientifically-based guidelines of national medical research, professional medical specialty organizations or governmental agencies that are accepted by the plan;

5.      Consistent with the diagnosis of the condition;

6.      Required for reasons other than the comfort or convenience of the patient or his or her *physician*; and

7.      Of demonstrated value based on clinical evidence reported by peer reviewed medical literature and by generally recognized academic medical experts; that is, it is not *investigational/experimental.*

(*Id.* ¶ 67.) Under the Plan, a "treatment, procedure, service, or supply must meet all seven of the criteria listed above to be considered medically necessary and to be eligible for coverage." (*Id.* ¶ 7.) The Plan defines "investigational/experimental" as follows:

A health product or service is deemed experimental if one or more of the following criteria are met:

*      Any drug not approved for use by the FDA; any drug that is classified as IND (investigational new drug) by the FDA; any drug requiring pre-authorization that is proposed for off-label prescribing;

*      Any health product or service that is subject to Investigational Review Board (IRB) review or approval;

*      Any health product or service that is the subject of a clinical trial that meets criteria for Phase I, II, or III as set for the by the FDA regulations;

4

* Any health product or service whose effectiveness is unapproved base on clinical evidence reported in *peer-reviewed medical literature*.

(*Id.* ¶ 8.) The Review Notification Coventry sent Neal gave the following reason for non-certification:

> Treatments, procedures, services or supplies, as determined by The Plan Administrator are expected to be of clear clinical benefit to the patient, appropriate for the care and treatment of the injury or illness and conform to the standards of good medical practice as supported by the applicable medical and scientific literature. The terms of your benefit plan require that treatments procedures, services or supplies be medically necessary. Our review has determined the services not to be medically necessary. Therefore, we are unable to recommend certification of the proposed services as medically necessary, as defined under your plan because: The medical necessity of the planned/proposed services is not supported by the medical information made available to us.

(Salvo Decl., Ex. K, CB000178.) A copy of the Review Notification was sent to UW Hospital and Dr. D'Alessandro, and the hospital was also notified by telephone.

Notwithstanding Coventry's refusal to certify the transplant as medically necessary, UW Hospital proceeded with the surgery, and on April 7, 2006, Neal underwent a liver-kidney transplant. (DPFOF ¶ 19.) After the transplant, Neal required additional medical care and hospitalization related to the transplant. (DPFOF ¶ 21; PPFOF ¶ 20.) From April 5, 2006 through October 29, 2007, Coventry received multiple claims submitted by medical care providers on Neal's behalf for transplant and transplant-related services, all of which were denied as not medically necessary. (DPFOF ¶ 23.) The billed charges on the claims that were denied total $518,388.20. During the same period, the Plan paid $108,598.63 for non-transplant-related claims by or on behalf of Neal. (*Id.* ¶¶ 24-25.) Each Review Notification advising Neal of a claim denial advised him of

5

his right to appeal the decision and expressly warned, "Your appeal must be submitted within 180 days from the date of receipt of this notification." (Decl. of Deana Johnson at FH000068.)

By letter dated September 19, 2007, counsel for Neal notified Coventry of his intent to appeal the denial of certification of his transplant surgery. Because the transplant surgery had already been performed, Coventry explained that the issue of certification was moot and agreed to treat counsel's September 19, 2007 letter as an appeal from its denials of his claims for benefits for services performed notwithstanding the denial of certification. (Salvo Decl., Ex. A. at CB0000001.) In subsequent correspondence, Neal's attorney expressed his understanding that Coventry had only 40 pages of the medical records in its file and indicated he was in the process of gathering additional medical records which would be forwarded on once they were received. (*Id.*, Ex. N.) The parties agreed that Coventry would "hold the appeal request open until the balance of Mr. Neal's medical treatment information could be provided. (*Id.*, Ex. P.) On January 23, 2008, Coventry received from counsel for Neal 1,977 pages of Neal's medical records from UW Hospital and Clinics, and Bellin Hospital – Ashwaubenon, where Neal received certain post-transplant care. (DPFOF ¶ 38.)

Christopher & Banks denied Neal's appeal and affirmed its previous denials of his benefit claims in a letter dated March 20, 2008. In its letter explaining its decision, Christopher & Banks drew a distinction between the benefit claim denials that had been processed prior to March 1, 2007, and those that had been processed after that date. As to all but two of the claims that were denied and processed prior to March 1, 2007, Christopher & Banks rejected Neal's appeal as untimely. Christopher & Banks noted that the Plan allowed 180 days to appeal and stated "[r]equests for appeal that do not comply with these procedures will not be considered, except in extraordinary circumstances." (Salvo Decl., Ex. A. at CB 000002.) "Consistent with the plan administrator's

6

obligation to the terms of the Plan," Christopher & Banks wrote, "we are hereby denying as untimely the current attempted appeal of the denials of transplant-related services that were processed during the period April 25, 2006-March 1, 2007." (*Id.*)

Neal had appealed from the denial of two claims relating to ambulance and transport services (totaling $14,104.55) that were processed before March 1, 2007, and Christopher & Banks agreed that his appeal was timely as to those claims. Christopher & Banks also concluded that counsel's letter of September 19, 2007 constituted a timely appeal from the denials of benefit claims that were processed after March 1, 2007. As to these claims that were timely appealed, and as an additional reason for denying those that were not, however, Christopher & Banks affirmed its previous determination that Neal's transplant was not medically necessary within the definition of the Plan. Christopher & Banks concluded that the transplant and transplant-related services provided to Neal did not meet the Plan's definition of "medically necessary" because they did not satisfy two of the Plan's seven criteria for medical necessity.

First, Christopher & Banks concluded that the services were not "[c]onsistent in type, frequency and duration of treatment with scientifically-based guidelines of national medical research, professional medical specialty organizations or governmental agencies that are accepted by the plan." (Salvo Decl., Ex. A, at CB 000003 (quoting Plan, Ex. B. at 76.)). In support of its conclusion, Christopher & Banks referenced "well-recognized scientific and medical guidelines for liver transplant in alcoholic patients" requiring abstinence for at least six months prior to the transplant, which even UW Hospital recognized. It noted that Dr. Shewmake had relied on these guidelines in his initial determination denying certification for the procedure, as had Dr. David K. Imagawa, M.D., a board-certified surgeon who Coventry had consulted for an outside independent

7

review. Dr. Imagawa had performed a medical review and prepared a written report dated February 22, 2008, in which he likewise concluded that the transplant was not "medically necessary" as defined by the Plan because Neal had not been abstinent from alcohol for a six-month period before the request was made. (Salvo Decl., Ex. E.) Dr. Imagawa stated that "[b]ased on early data on recidivism (University of Pittsburgh, University of Michigan) virtually all liver transplant programs and insurance companies have instituted a minimum six-month period of abstinence." (*Id.*) Acknowledging that "many articles continue to insist that the 'six-month rule' is arbitrary," Dr. Imagawa observed that even proponents of a more flexible policy recommended that patients who did not meet the six-month abstinence condition receive a psycho-social evaluation to assess their likelihood of relapse. (*Id.*) Neal had not undergone such an assessment, and based on the history, Dr. Imagawa thought it "quite unlikely that the patient had any insight into his disease process in April of 2006." (*Id.*) Given the short period of abstinence even after having undergone surgery for pancreatitis secondary to alcohol the previous year, Dr. Imagawa concluded "[b]y definition this patient must be considered an active alcohol user and is not a transplant candidate." (*Id.*) Based on its review of the entire record, Christopher & Banks explained in its denial letter that it had independently determined that the transplant and transplant-related services were not covered by the Plan because they were not medically necessary.

For the same reason, Christopher & Banks also concluded that the transplant and transplant-related services were investigational or experimental. It noted that "the effectiveness of such transplant is unproven based on clinical evidence reported in peer-reviewed medical literature" and "[t]here is a lack of consensus in the medical research community that transplantation with such limited pre-transplant abstinence is indicated." For this reason, as well, Christopher & Banks

8

concluded that the transplant could not be considered medically necessary within the meaning of the Plan. (*Id.*) And since the transplant services were not covered by the Plan, it necessarily followed that the portion of his claims that would be considered as claims for post-transplant complications were not covered because the Plan did not cover "[c]omplications arising from any non-covered surgery or treatment . . . ." (*Id.* (quoting the Plan at 43.))

It is this decision that the Court is called upon to review.


## DISCUSSION

As noted above, Christopher & Banks offered two reasons for its rejection of Neal's appeal from the denial of his claims for benefits under the Plan. As to those claims that were denied prior to March 1, 2007, Christopher & Banks affirmed its initial determination on the ground that Neal's appeal was untimely. As to the claims that had been timely appealed, and as an additional reason with respect to those that were not timely appealed, Christopher & Banks affirmed its initial determination that the claims were for services that were not covered by the Plan. Christopher & Banks concluded that the services were either not medically necessary as that term was defined by the Plan, or they were for complications arising from a non-covered surgery or treatment. I will address each of the proffered reasons in turn.

### A. Timeliness

Although ERISA does not expressly require that a claimant exhaust administrative remedies before filing suit, it does require every plan, in accordance with regulations of the Secretary of the Department of Labor ("DOL"), to "afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the

9

decision denying the claim." 29 U.S.C. § 1133(2). It makes little sense to require every plan to incur the effort and expense to provide an administrative procedure and not require claimants to use it. To allow every claimant to immediately file suit without exhausting available administrative remedies would undermine the claim procedure contemplated by the Act. Courts have therefore consistently required claimants to exhaust available administrative remedies before commencing suit in federal court. *Powell v. AT & T Comm., Inc.*, 938 F.2d 823, 825 (7th Cir.1991); *Kross v. Western Elec. Co., Inc.*, 701 F.2d 1238, 1244 (7th Cir.1983).

The Seventh Circuit has held that requiring exhaustion of administrative remedies furthers several important goals. Requiring exhaustion of administrative remedies minimizes the number of frivolous lawsuits, promotes non-adversarial dispute resolution, and decreases the cost and time necessary for claim settlement. *Gallegos v. Mount Sinai Medical Center*, 210 F.3d 803, 807-08 (7th Cir. 2000). Requiring administrative exhaustion also furthers Congress' intent that fund trustees have primary responsibility for claim processing. *Robyns v. Reliance Standard Life Ins. Co.*, 130 F.3d 1231, 1235 (7th Cir. 1997). It enables the compilation of a complete record in preparation for judicial review. *Gallegos*, 210 F.3d at 808. For these reasons, the Seventh Circuit has long held that "the intent of Congress is best effectuated by granting district courts discretion to require administrative exhaustion." *Id.; see also Powell v. AT & T Comm., Inc.*, 938 F.2d 823, 825 (7th Cir.1991). More recently, the Seventh Circuit has noted that "[e]xhaustion of administrative remedies is one of ERISA's requirements." *Contilli v. Local 705 Intern. Broth. of Teamsters Pension Fund*, 559 F.3d 720, 724 (7th Cir. 2009).

The ERISA regulations adopted by the DOL allow employers to impose a time limit on the right to appeal the denial of claims under a health benefit plan, so long as it is not shorter than 180

10

days. 29 C.F.R. § 2560.503-1(h)(3)(i). Where a claimant fails to appeal a denial of benefits under an employee plan within the prescribed time limit, the court will generally not reach the merits of her claim. *Burke v. Kodak Retirement Income Plan*, 336 F.3d 103, 107 (2d Cir. 2003); *Chapman v. ChoiceCare Long Island Term Disability Plan*, 288 F.3d 506, 511 (2d Cir.2002). Here, it is undisputed that Neal failed to appeal the denial of benefits within this time limit as to a substantial portion of the claims he asks the Court to review. Christopher & Banks contends that Neal's failure to file a timely appeal bars further review.

Neal argues in response that his failure to timely seek administrative review is excused because Christopher & Banks' notifications denying his claims were defective and because Christopher & Banks' own determination of his appeal was untimely. In support of this argument, Neal notes that every ERISA plan is required to:

> (1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and

> (2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

29 U.S.C. § 1133. The regulations promulgated by the Secretary of the DOL set certain minimum requirements for procedures and notification when a plan administrator denies a claim for benefits. The notification must set forth in a manner calculated to be understood by the claimant the following information:

> (i) The specific reason or reasons for the adverse determination;

> (ii) Reference to the specific plan provisions on which the determination is based;

11

(iii) A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary;

(iv) A description of the plan's review procedures and the time limits applicable to such procedures, including a statement of the claimant's right to bring a civil action under section 502(a) of the Act following an adverse benefit determination on review;

(v) In the case of an adverse benefit determination by a group health plan or a plan providing disability benefits,

> (A) If an internal rule, guideline, protocol, or other similar criterion was relied upon in making the adverse determination, either the specific rule, guideline, protocol, or other similar criterion; or a statement that such a rule, guideline, protocol, or other similar criterion was relied upon in making the adverse determination and that a copy of such rule, guideline, protocol, or other criterion will be provided free of charge to the claimant upon request; or

> (B) If the adverse benefit determination is based on a medical necessity or experimental treatment or similar exclusion or limit, either an explanation of the scientific or clinical judgment for the determination, applying the terms of the plan to the claimant's medical circumstances, or a statement that such explanation will be provided free of charge upon request.

29 C.F.R. § 2560.503-1(g).

Neal argues that Christopher & Banks' notifications of denial of his claims lack most of the information required by the regulation. He contends that the notifications failed to advise him that his claims were being denied because of the requirement of six months of pre-transplant abstinence and also failed to reveal the specific plan provisions on which the determination was based. (Pl.'s Br. Supp. Mot. for S.J. at 10.) While he was advised that the procedure was determined to be not medically necessary, he was not told which of the seven criteria it did not satisfy. He was not informed that "an internal rule, guideline, protocol, or other similar criterion was relied upon in making the adverse determination." (*Id.* at 11.) The Review Notifications for denial of the post-

12

transplant services were even worse, Neal contends. They simply listed the same reason that coverage for the transplant services was denied, namely, that they were not medically necessary. However, in its decision denying Neal's appeal Christopher & Banks explained that coverage for the transplant related services was denied based on the plan provision that excluded coverage for "[c]omplications arising from any non-covered surgery or treatment." Thus, Neal contends, Christopher & Banks changed its rationale for denying transplant-related claims.

Neal also claims that Christopher & Banks' determination of his appeal was untimely. Neal argues that Christopher & Banks was required to notify him of its decision within 30 days of his appeal because the claim appealed from was a "pre-service claim." 29 C.F.R. § 2560.503-1(i)(2)(ii). Neal notes that Coventry received his appeal on September 26, 2007, and did not issue its decision until March 20, 2008. Although Neal did not provide Coventry with all of his medical records until January 23, 2008, he claims that Christopher & Banks's decision was untimely even if the later date is used as the date of filing. Neal contends, however, that in fact this is too generous an interpretation since the Department's regulations state that "the period of time within which a benefit determination on review is required to be made shall begin at the time an appeal is filed in accordance with the reasonable procedures of the plan, without regard to whether all the information necessary to make a benefit determination on review accompanies the filing." 29 C.F.R. § 2560.503-1(i)(4). Given these deficiencies in Christopher & Banks' notifications and the untimeliness of its determination of his appeal, Neal argues that Christopher & Banks' has forfeited the defense that his appeal was untimely.[1]

---

[1]Neal also contends that Christopher & Banks' failure to provide proper notification of its denial and issue its determination of his appeal in a timely manner deprives it of the deferential standard of review that would otherwise apply. That argument is addressed below.

13

I cannot find on this record that Christopher & Banks' determination of Neal's appeal was untimely. The claims at issue were post-service, not pre-service, claims.[2] In other words, Neal did not appeal the pre-service denial of certification of his transplant as not "medically necessary" until after the surgery and related services were performed and his claims for payment of the costs of those services were denied. Under these circumstances, the Plan provides that the appeal is treated as an appeal from a claim denial. (Salvo Decl., Ex. B at 65.) In the case of group health plans that provide for one appeal of an adverse benefit determination, the appeal must be decided not later than 60 days after receipt by the plan of the claimant's request for review. 29 C.F.R. § 2560.503-1(i)(2)(iii). Although Neal, through his attorney, notified Christopher & Banks of his request to appeal on September 19, 2007, he did not provide the additional records on which his claim was based until January 23, 2008. Indeed, Neal specifically asked Christopher & Banks to hold his appeal in abeyance until the additional records were provided. (Salvo Decl., Ex. P.) Under these circumstances, the appeal was not filed "in accordance with the reasonable procedures of the plan," 29 C.F.R. § 2560.503-1(i)(4), during the time Neal requested Christopher & Banks to hold it in abeyance. The time within which Christopher & Banks was required to issue its decision on the appeal therefore began on January 23, 2008, and Christopher & Banks' decision on the appeal on March 20, 2008, fell within the 60 days allowed.

---

[2] Under the DOL regulation, "[t]he term 'pre-service claim' means any claim for a benefit under a group health plan with respect to which the terms of the plan condition receipt of the benefit, in whole or in part, on approval in advance of obtaining medical care." 29 C.F.R. § 2560.503-1(m)(2). A post-service claim is any claim that is not a pre-service claim. Although the Plan requires prior notification for transplants and certifies them as medically necessary, payment of benefits is not conditioned on pre-service certification, as this case demonstrates. (Salvo Decl., Ex. B. at 22-25.) Otherwise, Christopher & Banks would have simply denied the claims for failure to obtain such certification.

14

Even though Neal's argument that Christopher & Banks' determination of his appeal was untimely fails, there is merit in his argument that the notifications of adverse benefit determinations were defective and that they therefore failed to trigger the 180-day appeal limit. Courts have generally held that a notice of denial which fails to comply with 29 C.F.R. § 2560.503-1 does not trigger a time bar contained within the plan. *White v. Jacobs Eng'g Group Long Term Disability Benefit Plan*, 896 F.2d 344, 349-50 (9th Cir.1989); *Challenger v. Local Union No. 1 of Int'l Bridge, Structural and Ornamental Ironworkers, AFL-CIO*, 619 F.2d 645, 648 (7th Cir.1980); *Ross v. Diversified Ben. Plans, Inc.*, 881 F. Supp. 331, 334 (N.D. Ill.,1995); *Garland v. General Felt Industries, Inc.*, 777 F. Supp. 948, 951 (N.D. Ga. 1991). The requirement in 29 U.S.C. § 1133(2) that plan administrators "afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review" supports this result. As the Ninth Circuit explained in *White*:

> The legislators regarded claimants' awareness of the specific reasons for denial of their benefits as sufficiently important to their ability to obtain full and fair reviews of their claims to require explicitly that plans enumerate the reasons in the written notice of the right to appeal. 29 U.S.C. § 1133(1). To allow plan appeal boards to bar a claimant's untimely appeal when the claimant was improperly notified of his or her right to appeal would circumvent this policy. Plan boards could with impunity deter claimants from timely appealing by sending vague and inadequate appeal notices, withholding information claimants need to appeal effectively.

896 F.2d at 351.

This is apparently what occurred here. The plan administrator is required to provide claimants with written or electronic notification of any "adverse benefit determination." 29 C.F.R. § 2560.503-1(g)(1). The notifications Neal received, however, which were entitled "Review Notifications," were confusing on their face. Instead of informing Neal that an adverse

15

determination had been made and benefits were denied, the notification set forth the recommendation of First Health, the claims administrator, to Christopher & Banks. Each notification states: "Based on the information available, First Health has made the following recommendation." (Johnson Decl. at FH 000146.) The notification then lists the number of hospital days or services reviewed, and indicates whether they are either certified as medically necessary or non-certified. (*Id.*) The reason for non-certification is listed, but again it is stated in terms of a recommendation, as opposed to a determination. The Review Notification for Neal's kidney transplant, for example, after indicating that the claims administrator's review has determined the services or supplies not to be necessary, states:

> Therefore, we are unable to recommend certification of the proposed services as medically necessary, as defined in you plan because: the medical necessity of the planned/proposed services is not supported by the medical information made available to us.

(*Id.*) In other words, it appears from the notification that the claims administrator was advising Neal of its recommendation to the Plan Administrator and not of an adverse benefit determination. Moreover, by stating that its recommendation was based on "the medical information available to us," the notification suggested that the recommendation was not final and could be changed if additional information was received. The notification did not indicate what that additional information might be, however.[3]

-------

[3] Dr. Imagawa noted, for example, that agencies that do not require a six-month abstinence period, such as the United Network of Organ Sharing ("UNOS"), advocate for a psycho-social evaluation instead to insure the patient has insight into his condition and is committed and likely to remain abstinent thereafter. (Salvo Decl., Ex. E, at Christopher & Banks 000123.) Had Christopher & Banks informed Neal that he needed such an evaluation, he presumably could have obtained it prior to the transplant. To the extent such an evaluation would have been given consideration by Christopher & Banks, its notification was defective in failing to state as much. *See* 29 C.F.R. § 2560.503-1(g)(iii).

16

The Review Notifications also failed to state "the specific reason or reasons for the adverse determinations" and failed to reference "the specific plan provisions on which the determination [was] based, as required by 29 C.F.R. § 2560.503(g)(1)(i) and (ii). The statement that "[t]he medical necessity of the planned/proposed services is not supported by the medical information made available to us" (Johnson Decl. at FH 000147), in the context of this case, is not adequate notice of the "specific reasons for such denial, written in a manner calculated to be understood by the participant." 29 U.S.C. § 1133(1). Without the narrower definition of the phrase "medically necessary" contained in the Plan and some reference to the six-month abstinence requirement, the idea that this life-saving surgical transplant was not necessary made no sense. As Mrs. Neal noted in her March 9, 2007 letter to Coventry, "[y]our explanation for denial 'Benefits denied because the plan provides benefits only for covered services and supplies that are medically necessary as defined by you plan' really tells me **nothing**. **Please explain this, exactly what are you referring to?**" (Johnson Decl. at FH 000177.) (emphasis original). Three months later, Mrs. Neal, still trying to understand why her husband's claims were not being paid, observed in another letter to Coventry, "[i]t is very clear that what you define as 'medically emergency' and what we define as a 'medical emergency' are very different." (Johnson Decl. at FH 000176.) Indeed, the record suggests that it was the failure to provide specific reasons for the denial that caused Neal to delay his appeal. Mrs. Neal's mother, Mary Volm, also called Coventry seeking an explanation. Coventry's own records indicate that when in April of 2007 she was told that they had failed to submit their appeal within 180 days, Ms. Volm said "she has tried to appeal however we [Coventry] will not be clear as to the reason for denial and she is unclear on how to respond until she understands the specific clinical rationale for the denial." (Doc. #35, at Christopher & Banks 000161.)

17

Christopher & Banks contends it was not required to be more specific because its Notification of Review indicated certification was denied because the services were deemed not medically necessary within the meaning of the Plan and informed Neal that "[t]he clinical rationale used in making this determination is available in writing upon request." (Def.'s Add'l PFOF ¶ 7.) Christopher & Banks argues that 29 C.F.R. § 2560.503-1(g)(1)(v)(B) permits the plan administrator to offer to provide a statement of the "explanation of the scientific or clinical judgment for the determination" upon request in lieu of providing the specific reason or reasons for the determination and reference to the specific plan provisions upon which its determination is based when the adverse benefit determination is based on a medical necessity or experimental treatment or similar exclusion, as it was here.[4] Moreover, when Neal's mother-in-law finally made such a request in April 2007, it sent Neal a response the following month which explained, "[t]he rationale for the adverse determination was that a patient requesting a liver/kidney transplant must be free from alcohol for a minimum of 6 months according to internal review." (*Id.* ¶ 9.) The clarification also referenced the Plan provision excluding coverage for complications arising from non-covered surgery or treatment. (*Id.*) Thus, Christopher & Banks concludes that its Notifications of Review were not defective.

But nothing in the language of the regulation suggests that an offer to provide, upon request, an explanation of the scientific or clinical judgment for a determination that a proposed procedure is medically unnecessary can be made in lieu of providing the specific reason or reasons and

---

[4] At the hearing on the motions for summary judgment, Neal also argued the Notifications failed to fully comply with this provision because they did not indicate that the explanation would be provided "free of charge." I disagree. To offer to provide further information "upon request" with no further qualification certainly implies it is without cost.

18

reference to the plan language upon which the determination is based. The regulation is not disjunctive. It requires a statement of the specific reason or reasons for the determination, as well as reference to the specific plan provision on which the determination is based. If the denial is based on a medical necessity or experimental treatment exclusion, the explanation of the scientific or clinical judgment for the determination can be provided later on request. This is not an excuse, however, for the plan administrator to ignore its other obligations under the regulation.

In *Ross v. Diversified Benefit Plans, Inc.*, the plan administrator offered the following reasons for denying the plaintiff's claim: "PRE-EXISTING CONDITION, REFER TO PLAN BOOK" and "This claim has since been determined to be pre-existing." 881 F. Supp. at 334. The court concluded that the notification was defective, stating:

> Clearly, Diversified offered only a conclusion that Brian Ross had a pre-existing condition without any explanation or rationale in support of its decision. This is precisely the sort of bare conclusion that the Seventh Circuit has found violative of 29 U.S.C. § 1133. *See Halpin v. W.W. Grainger, Inc.*, *supra*, 962 F.2d at 693; *Wolfe v. J.C. Penney Co., Inc.*, *supra*, 710 F.2d at 392. *Accord, Richardson v. Central States, Southeast & Southwest Areas Pension Fund, supra*, 645 F.2d at 665; *Grossmuller v. Int'l Union, United Automobile Aerospace and Agricultural Implement Workers of America*, 715 F.2d 853, 858 (3rd Cir.1983).

*Id.* at 334-45. For this reason, and because the notification failed to advise the plaintiff of the steps to be taken for obtaining review, the court concluded that the notice did not comply with 29 U.S.C. § 1133 and thus the sixty-day time bar of the plan was never triggered. *See also DeMatte v. Brotherhood of Industrial Workers' Health and Welfare Fund*, No. 94-1114-CIV-T-21C, 1996 WL 764540, at *3 (M.D. Fla. Aug. 13, 1996) ("A review of the notification letter sent from Defendant to Ms. DeMatte reveals that the notice was inadequate to trigger a time limitation for seeking an appeal. Although the notification letter sets forth the grounds for the denial of eligibility under the

19

plan in a general manner, the notice fails to give specific information regarding those grounds. For example, the notice states that Ms. DeMatte's purported employer failed to report and make contributions on behalf of its eligible employees. However, the notice does not indicate the manner in which Plaintiff failed to report information and does not provide specific information regarding the inadequacy of contributions. Additionally, the notice makes no reference to pertinent plan provisions under which Defendant denied Ms. DeMatte benefits.")

I reach the same conclusion here. The Review Notifications provided to Neal fail to comply with 29 C.F.R. § 2560.503-1(g)(1). The Notifications failed to set forth, in a manner calculated to be understood by the claimant, the specific reason or reasons for the adverse determination and the specific plan provisions on which the determination was based. Because of these defects in the Notifications, the 180-day time limit was not triggered. Neal's appeal was therefore timely as to all of his claims. I must therefore review the merits of Christopher & Banks' denial of all of Neal's claims, but first I must address the standard of review.

**B. Standard of Review**

A denial of benefits under an ERISA plan is subject to *de novo* review unless the benefit plan gives the administrator discretionary authority to determine a participant's eligibility for benefits. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). On the other hand, if the plan gives the administrator discretionary authority to interpret the plan and subsequently make eligibility determinations, a court will overturn the decision of the administrator only if the decision is arbitrary and capricious. *O'Reilly v. Hartford Life and Accident Ins. Co.*, 272 F.3d 955, 959 (7th Cir. 2001).

The arbitrary and capricious standard has been expressed as follows:

20

> [A] court will not set aside the denial of a claim if the denial is based on a reasonable interpretation of the relevant plan documents. Nor will it do so where the trustee has based its decision "on a consideration of the relevant factors" that encompass the "important aspects of the problem" before it. If the trustee makes an informed judgment and articulates an explanation for it that is satisfactory in light of the relevant facts, i.e., one that makes a "rational connection" between the issue to be decided, the evidence in the case, the text under consideration, and the conclusion reached, then the trustee's decision is final.

*Cuddington v. N. Ind. Pub. Serv. Co.*, 33 F.3d 813, 817 (7th Cir. 1994) (quoting *Exbom v. Cent. States, Se. & Sw. Health & Welfare Fund*, 900 F.2d 1138, 1142-43 (7th Cir. 1990) (citations omitted)).

The Seventh Circuit has suggested the following "safe-harbor" language that can be used to insure that a plan gives the plan administrator broad discretionary power and thereby insure deferential review: "Benefits under this plan will be paid only if the plan administrator decides in his discretion that the applicant is entitled to them." *Herzberger v. Standard Ins. Co.*, 205 F.3d 327, 331 (7th Cir.2000). While this exact wording is not required, a plan must indicate "with the requisite if minimum clarity that a discretionary determination is envisaged" if a deferential standard of review is to apply. *Id.; Diaz v. Prudential Ins. Co. of America*, 424 F.3d 635, 637 (7th Cir. 2005).

The language of the Plan meets this standard. As noted above, it gives the plan administrator "the sole discretionary authority to determine eligibility for plan benefits or to construe the terms of the plan." (DPFOF ¶ 2; Decl. of Glenn Salvo, Ex. B at 79.) It further provides that "benefits under the plan will be paid only if the plan administrator decides in its discretion, that the participant or beneficiary is entitled to such benefits." (*Id.*) This language is more than sufficient to "give the employee adequate notice that the plan administrator is to make a judgment largely insulated from judicial review by reason of being discretionary." *Diaz*, 424 F.3d at 637.

21

While Neal does not dispute that the Plan grants Christopher & Banks discretionary authority to determine claims for benefits, he argues that Christopher & Banks forfeited its right to deferential review by failing to properly process his claims. This argument, like his argument that the 180-day appeal time limit was never triggered, rests on Neal's contentions that notifications of adverse benefit determinations were defective and that Christopher & Banks' determination of his appeal was untimely. Neal argues that when a plan fails to provide the minimum procedural protections mandated by 29 C.F.R. § 2560.503-1, the plan forfeits its right to a deferential review and the standard becomes de novo.

In support of this argument, Neal cites *Reeves v. UNUM Life Insurance Co. of America*, 376 F. Supp.2d 1285 (W.D. Okla. 2005), in which the court held that under the current DOL regulation, judicial review is de novo where the plan administrator fails to issue a timely determination of the claimant's appeal. The *Reeves* court noted that the DOL had amended its regulation in 2000. Prior to 2000, the regulation provided that if a plan failed to issue a determination of an appeal within the time allowed under the DOL regulation, the claim was deemed denied. 29 C.F.R. § 2560.503-1(h) (1999). The 2000 amendments, which became effective January 1, 2002, shortened the time limits for determination of at least some appeals and removed the language that said that violations of the time limitations would result in the claim being "deemed denied." *See* 65 Fed.Reg. 70,246 (Nov. 21, 2000). The current regulation provides:

> In the case of the failure of a plan to establish or follow claims procedures consistent with the requirements of this section, a claimant shall be deemed to have exhausted the administrative remedies available under the plan and shall be entitled to pursue any available remedies under section 502(a) of the Act on the basis that the plan has failed to provide a reasonable claims procedure that would yield a decision on the merits of the claim.

29 C.F.R. § 2560.503-1(l).

22

Under the previous regulation, courts were split over the issue of what standard of review the courts were to apply in cases in which the claims were "deemed denied" because of the failure to issue a timely determination. The majority of the circuits held that in such circumstances de novo review was appropriate, *see Nichols v. Prudential Ins. Co. of Am.*, 406 F.3d 98, 109 (2nd Cir.2005) (applying de novo review); *see also Gritzer*, 275 F.3d at 296 (same); *Gilbertson*, 328 F.3d at 632 (same), while others held that deferential review still applies. *See Se. Farm Bureau Life Ins. Co. v. Moore*, 993 F.2d 98, 101 (5th Cir.1993) (applying deferential standard of review); *see also Gatti v. Reliance Standard Life Ins. Co.*, 415 F.3d 978, 982 (9th Cir. 2005) (failure to comply with 29 C.F.R. § 2560.503-1(h) (1999) does not alter standard of review). Most courts, including the Seventh Circuit, had also held that under the previous regulation substantial compliance with 29 C.F.R. § 2560.503-1(g)(1) was sufficient. *Militello v. Central States, Southeast and Southwest Areas Pension Fund*, 360 F.3d 681, 689 (7th Cir. 2004); *Tolle v. Carroll Touch, Inc.*, 23 F.3d 174, 180 (7th Cir. 1994); *Gilbertson*, 328 F.3d at 636; *Kent v. United of Omaha Life Ins. Co.*, 96 F.3d 803,807 (6th Cir. 1996); *Brogan v. Holland*, 105 F.3d 158, 165 (4th Cir. 1997); *Perrino v. Southern Bell Tel. & Tel. Co.*, 209 F.3d 1309 (11th Cir. 2000). By providing in the 2000 amendment that a plan's failure to establish or follow the minimum requirements for adequate notice and full and fair review would result in the claimant having been deemed to have exhausted all administrative remedies, instead of the claim being deemed denied, the DOL intended to make clear that a plan's failure to provide the mandated procedural protections would deprive the plan's determination of the deference it might otherwise receive. *See* 65 Fed. Reg. at 70255 ("The Department's intentions in including this provision in the proposal were to clarify that the procedural minimums of the regulation are essential to procedural fairness and that a decision made in the absence of the

23

mandated procedural protections should not be entitled to any judicial deference."). The court in *Reeves* concluded from its commentary on the amended regulations that the DOL also intended to eliminate the notion that substantial compliance was sufficient to preserve a plan's right to deferential review. 376 F. Supp. 2d at 1293-94. Thus, in *Reeves*, the court held that where the plan administrators failed to issue a timely decision on the claimant's appeal or timely request an appeal, the applicable standard of review was de novo. Neal argues that the same reasoning applies here.

Unlike *Reeves*, however, the plan administrator in this case did in fact issue a determination of Neal's appeal. In other words, there was an actual decision rendered prior to the lawsuit to which I can defer. In addition, I have found that administrator's determination was timely. Neal argues that the defects in Christopher & Banks' adverse claim notifications are enough to require de novo review, but in my view this goes too far. While I agree that the defective notifications did not trigger the appeal time, I am not convinced that the defects are sufficient to warrant abandonment of the deferential standard of review that ERISA affords the administrator's decision. Contrary to *Reeves*, other courts have held under the current regulation that even where the plan's determination of an appeal is untimely, the deferential standard of review nevertheless applies if the plan has actually issued a decision and its failure to comply with the regulations was not flagrant. *See, e.g., Neathery v. Chevron Texaco Corp. Group Accident Policy No. OK 826458*, No. 05-1883, 2006 WL 4690902, at *8 (S.D.Cal. July 31, 2006) ("Under *Gatti*, a non-flagrant failure to render a decision in accordance with the time line set forth in the regulations will not change the standard of review. It is likely that the Ninth Circuit will apply this rule to the amended regulations as well."); *Peterson v. Fed. Express Corp. Long Term Disability Plan*, No. 05-1622, 2006 WL 1495307, at *6 (D. Ariz. May 24, 2006) ("[I]t is unlikely the Ninth Circuit would interpret [post-amendment ERISA] as

24

requiring de novo review every time a plan administrator violates ERISA, no matter how inconsequential the violation."); *see also Goldman v. Hartford Life & Acc. Ins. Co.*, 417 F. Supp.2d 788, 804 (E.D. La.2006) (noting that "nothing about the new regulation is inconsistent with the idea of looking to the record in each case to determine if deference is warranted notwithstanding the administrator's failure to comply with the regulation.").

Although the Seventh Circuit has not addressed the precise issue, it seems likely that absent a flagrant failure to provide the mandated procedures, it would apply the deferential standard of review under these circumstances. The regulation provides that failure to provide the mandated procedures results in the administrative remedies being "deemed exhausted", but there is no reason to deem the administrative remedies exhausted when, as here, they have in fact been exhausted. Neal's argument is based on the principle that where a plan administrator unreasonably delays or deprives a claimant of a fair administrative review of its initial denial of a claim, the administrative remedies will be deemed exhausted so that the claimant can immediately seek judicial review. When that occurs, there is usually no decision of the administrator to defer to, so no deference is afforded; judicial review is, by necessity, de novo. *Reeves*, 376 F. Supp.2d at 1292 ("[T]here is no deference to an administrator's expertise when the administrator fails to exercise that expertise and render a reasoned decision.). That principle has no application here, however. Neal has not been deprived of administrative review. He appealed the initial denial and was granted the discretionary review that the Plan affords. His administrative remedies under the Plan have therefore been exhausted and he is entitled to seek judicial review. That review, however, is deferential. *See Demirovic v. Building Service 32 B-J Pension Fund*, 467 F.3d 208, 212 (2d Cir. 2006) ("In *Nichols*, the insurer's inaction 'le[ft] the court without any decision or application of expertise to which to

25

defer.' . . . . Here, by contrast, rather than go directly to court when the Fund failed to issue a timely initial determination, Demirovic chose to appeal. She then waited for and received a timely decision on her appeal. This eventual decision constitutes a final decision and exercise of the Fund's discretion, to which we must defer. Accordingly, we will apply arbitrary and capricious review to the Fund's determination."); *see also Pakovich v. Broadspire Services, Inc.*, 535 F.3d 601 (7th Cir. 2008) (holding that when an ERISA plan administrator has not issued a decision on a claim for benefits that is before the courts, the matter must be sent back to the plan administrator to address the issue in the first instance).

One further issue concerning the standard of review must be addressed. Neal contends that even if the Court does not find that Christopher & Banks has waived its right to a deferential standard of review, the Court must take into consideration that fact that Christopher & Banks, as administrator, had an inherent conflict of interest since the Plan is self-funded. In other words, because Christopher & Banks is a payer under the Plan, it has an incentive to deny claims for benefits that may be due. Neal suggests that this factor should be given greater consideration here because of the amount of money at issue and because Christopher & Banks is less likely to be concerned about a former employee than a current one.

In *Metropolitan Life Ins. Co. v. Glenn*, 128 S. Ct. 2343, 2350 (2008), the Supreme Court held that such a conflict is a factor that the court must take into consideration in deciding whether the administrator has abused its discretion in denying a claim. The Seventh Circuit, however, has rejected the suggestion that *Glenn* "fundamentally altered the paradigm for adjudicating ERISA claims" by requiring the reviewing court to conduct a more searching review. *Love v. National City Corp. Welfare Benefits Plan*,--- F.3d ----, 2009 WL 2178667, *5 n.1 (7th Cir. 2009). "In such cases,

26

like the one we have here, the standard of review remains the same, but the conflict of interest is 'weighed as a factor in determining whether there is an abuse of discretion.'" *Jenkins v. Price Waterhouse Long Term Disability Plan*, 564 F.3d 856, 861 (7th Cir.2009) (quoting *Glenn*, 124 S. Ct. at 2350). Here, the conflict is less significant because the Plan is funded through both employer and covered-individual contributions. (Salvo Decl., Ex. B, at 15.) Thus, there is not the dollar-for-dollar motive to deny benefits that was before the Court in *Glenn*. Moreover, *Glenn* itself suggests that while the presence of a conflict may be a significant factor in cases "where an insurance company administrator has a history of biased claims administration," . . . . [i]t should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits." 128 S. Ct. at 2351. Christopher & Banks took such steps here. It delegated initial claims processing to a third-party administrator, Coventry, which had no knowledge Neal was a former employee, as opposed to a current employee. In addition, during the appeals process, Coventry's medical director referred the cased for an outside expert, Dr. Imagawa, who likewise concluded that the transplant related services were not covered by the Plan. Under these circumstances, I find the conflict is only a slight factor to be considered in assessing whether Christopher & Banks' decision denying Neal benefits for his transplant and transplant-related services was arbitrary and capricious. With this standard in mind, I now turn to the merits of Christopher & Banks' denial of benefits.

**B. The Merits**

As noted above, Christopher & Banks denied Neal health benefits for the transplant and transplant-related services he received because it concluded the liver transplant proposed by his doctors was not medically necessary within the meaning of the Plan. More specifically, Christopher & Banks concluded that transplant was not "[c]onsistent in type, frequency and duration of treatment with scientifically-based guidelines of national medical research, professional medical specialty organizations or governmental agencies that are accepted by the plan" (Plan at 76) because Neal had not been abstinent from alcohol for at least six months at the time he requested certification. Christopher & Banks contends that well-recognized scientific and medical guidelines for liver transplant in alcoholic patients which are accepted by the Plan provide that patients in need of a transplant due to alcoholic liver disease must abstain completely from alcohol for a minimum of six months. Since it is undisputed that Neal had not been abstinent for six months before his transplant, he did not meet the guideline and the treatment proposed therefore was not "medically necessary" within the Plan's definition of that term.

In support of its argument that its decision was not arbitrary or capricious, Christopher & Banks notes that it first consulted with Dr. Shewmake, to whom Neal's proposed transplant was first submitted for certification. Dr. Shewmake provided Christopher & Banks five pages of medical guidelines for adult liver transplant which list as an indication for transplant "No smoking, drugs, or alcohol for at least 6 months prior to transplant," and includes as an absolute contraindication, "Active alcohol and/or substance abuse with recidivism." (D PFOF ¶ 57.) Christopher & Banks also requested an outside review by a peer review analysis firm which assigned Dr. Imagawa to determine whether the transplant met the elements of the Plan's definition of medically necessary.

28

(Salvo Decl., Ex. E.) Dr. Imagawa confirmed Christopher & Banks' initial determination, referencing in his report a publication of the National Institute On Alcohol Abuse and Alcoholism ("NIAA"), entitled <u>Liver Transplantation for Alcoholic Liver Disease</u> (hereinafter "NIAA article"). (*Id.*, Ex. F.) Christopher & Banks also considered a February 2008 article in the journal *Liver Transplantation* entitled <u>Meta-Analysis of Risk For Relapse to Substance Abuse After Transplantation of Liver or Other Solid Organs</u> (hereinafter "Meta-Analysis article" ). (*Id.*, Ex. G.)

Both articles acknowledge the existence of the six-month rule upon which Christopher & Banks relied for its determination even if only to question its empirical support. The NIAA article referenced by Dr. Imagawa observed:

> Some researchers consider an abstinence period of 6 months prior to OLT [orthotopic liver transplantation] a predictor of long-term abstinence (Beresford and Everson 2000; Weinrieb et al. 2000). Some transplant programs and insurance companies insist on an absolute 6-month period of abstinence before a patient with ALD [alcoholic liver disease] can be listed for transplantation. This 6-month rule remains controversial, however, and appears arbitrary. Some studies favoring the 6-month rule have demonstrated that patients who are abstinent for less than 6 months have a greater relapse rate (Beresford and Everson 2000; Weinrieb et al 2000), but these studies only examined short periods of time, included only a small number of patients, and did not include control subjects. In contrast, many retrospective and prospective studies have demonstrated that the 6-month rule does not predict long-term sobriety after OLT (see table 1). As a result, the current minimal listing criteria for liver transplantation proposed by UNOS [United Network of Organ Sharing] do not require a 6-month period of abstinence before listing ALD patients for liver transplantation.

(*Id.* Ex. F. at 4.) The Meta-Analysis article likewise cited the six-month rule as one of "the wide-spread promotion strategies believed to reduce post-transplantation relapse risk," but observed that "reviews note that the empirical evidence linking such factors to post-transplantation relapse remains sparse and contradictory." (*Id.* Ex. G. at 2.) The article goes on to note that the limited statistical impact pre-transplant abstinence has as a predictive factor "may be due to the fact that

29

transplant programs strive to apply the '6-month rule' as a key criterion for candidate selection." (*Id.* at 10.) The author reasons: "If the highest risk patients (those with shorter or no abstinence) are largely eliminated from the candidate pool, then it would be expected that this variable should show only a limited correlation with relapse." (*Id.*)

Finally, Christopher & Banks notes that the letter from Dr. D'Alessandro, Neal's own physician, requesting certification of the procedure, is itself evidence of the existence of such a guideline in that it references the University of Wisconsin Hospital's "normal abstinence period" of six months. In view of this evidence, Christopher & Banks contends that its decision was entirely reasonable and must be upheld. At the very least, Christopher & Banks argues, its decision cannot be considered arbitrary and capricious.

In response, Neal argues as an initial matter that the Plan has the burden of proving that his transplant was not medically necessary. Citing *Santaella v. Metropolitan Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997), Neal notes that "analysis of an ERISA claim proceeds much like analysis of a claim for breach of an insurance policy." (Pl.'s Br. In Supp. Mot. S.J. at 12.) When the Plan contends that coverage is excluded, Neal argues that the burden of proving the applicability of the exclusion lies with the Plan and the administrator. (*Id.*) (citing *Stamp v. Metropolitan Life Ins. Co.*, 531 F.3d 84 (1st Cir. 2008).

*Santaella*, however, involved a de novo review of an administrator's decision. Here, I have already concluded that the review is under the arbitrary and capricious standard. More importantly, the Plan's denial of coverage in this case did not rest upon an exclusion in the policy. In order to obtain coverage, it was Neal's obligation to demonstrate that the treatment was "medically necessary". Because the "medically necessary" provision of the insurance contract is set forth in

30

the contract benefits section, as opposed to the exclusions section, Neal bears the burden of proof of establishing his entitlement to insurance benefits. *Fuja v. Benefit Trust Life Insurance Co.*, 18 F.3d 1405, 1408 (7th Cir. 1994).

Neal next argues that the refusal to cover his liver transplant is unsupported by the evidence and further, that the refusal to cover his liver transplant misconstrues the terms of the plan. (Pl.'s Br. In Supp. at 13.) Neal argues that the record does not support the Plan's contention that his transplant was inconsistent with well-recognized scientific and medical guidelines for liver transplants in alcoholic patients. Indeed, he contends that the two articles contained in the record refutes this very contention. The articles make clear that liver transplantation is the only definitive treatment for liver failure, even in alcoholic patients. Moreover, the six-month rule is described as "arbitrary" and is not one of the criteria utilized by UNOS, "the organization that administers the nation's only Organ Procurement and Transplantation Network ("OPTN"), established by the U.S. Congress in 1984." (*Id.* at 14) (quoting www.unos.org/whoweare/.)

The fact that UNOS does not mandate a six-month period of abstinence, however, is not determinative. The guidelines upon which the Plan may rely in determining whether a proposed treatment is medically necessary include those of "national medical research, professional medical specialty organizations or governmental agencies that are accepted by the Plan". (DPFOF ¶ 6.) The Plan does not require that the guideline be adopted by all such entities, or even most. The articles and Dr. Imagawa's report make clear that some, if not most, hospital transplant programs have instituted such a guideline.

Neal also argues that it is clear from the two articles upon which Christopher & Banks relied that the six-month rule itself is arbitrary. In essence, Neal argues that a decision that rests upon an

arbitrary rule is in fact arbitrary itself. But the articles only indicate that the rule has been criticized as arbitrary. In fact, the articles cite the studies upon which the guideline is based. Indeed, the Meta-Analysis article suggests that the correlation between pre-transplant abstinence of six months or less and post-transplant relapse may be understated as a result of the application of the six-month guideline. (Salvo Decl., Ex. G. at 10.) Thus, the fact that the rule is stringently applied may explain the absence of data concerning its effectiveness. More importantly, Neal's argument assumes that it is the role of the Court to determine whether the scientific basis for a particular guideline passes muster. But that would make the Court the arbiter of which scientifically-based guidelines the Plan must accept. That judgment is entrusted to the Plan Administrator, not the Court. The fact that Christopher & Banks has relied upon a scientifically-based guideline of a professional medical specialty organization, namely the six-month rule adopted by many transplant programs and supported by the studies described in the two articles, provides a rational basis for its decision. It may not be the decision this Court would make, but the Court is unable to say that it is arbitrary or capricious.

Finally, Neal argues that Christopher & Banks has misconstrued the Plan by inserting into the concept of medical necessity the ethical concern about the proper allocation of livers. Neal argues that the six-month rule is based on the concern that patients with alcohol liver disease who have not been abstinent for six months have a greater risk of relapse thereby damaging the transplanted liver. Given the shortage of donated livers, the rule reflects a desire to insure that they are not "wasted" on a patient who eventually relapses. Such ethical concerns, he argues, whether well founded or not, stand apart from the question of whether the transplants are medically necessary. But concern that livers be distributed to patients with the best chances of survival is an

32

acceptable medical criterion. *See Barnett v. Kaiser Foundation Health Plan, Inc.*, 32 F.3d 413, 417 (9th Cir. 1994). Christopher & Banks' reliance on the rule was not arbitrary and capricious.

I note in closing that this case is not about whether Neal should have received a liver/kidney transplant. Thankfully, he has and is still alive. The question the Court has addressed is whether Christopher & Banks' employee benefit plan was required to pay for his transplant. For the reasons stated, I have concluded that the determination of whether the transplant was medically necessary within the meaning of the Plan is entrusted to the discretion of the administrator subject to the arbitrary and capricious standard of review. While the six-month rule relied upon by the Plan has been criticized, I cannot say that the Plan's reliance on it is arbitrary and capricious. Accordingly, its determination must stand. Christopher & Banks' motion for summary judgment is therefore granted, and this action is ordered dismissed. The Clerk is directed to enter judgment forthwith.

**SO ORDERED** this __28th__ day of August, 2009.

s/ William C. Griesbach
William C. Griesbach
United States District Judge